In the

# United States Court of Appeals
## For the Seventh Circuit

————————————

Nos. 24-3248, 24-3249, & 25-1024

LSP TRANSMISSION HOLDINGS II, LLC, et al.,

*Plaintiffs-Appellees,*

*v.*

JAMES F. HUSTON, Chairman,
Indiana Utility Regulatory Commission, et al.,

*Defendants-Appellants,*

*and*

NORTHERN INDIANA PUBLIC SERVICE COMPANY, et al.,

*Intervening Defendants-Appellants.*

————————————

Appeals from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 24-cv-1722 — **Tanya Walton Pratt**, *Chief Judge.*

————————————

ARGUED JANUARY 27, 2025 — DECIDED MARCH 13, 2025

————————————

Before HAMILTON, SCUDDER, and JACKSON-AKIWUMI,
*Circuit Judges.*

HAMILTON, *Circuit Judge.* Plaintiff LSP Transmission Hold-
ings II, LLC, and several of its affiliates seek to build and

operate interstate electricity transmission lines in Indiana. An Indiana statute gives incumbent electric companies rights of first refusal to build and operate new interstate transmission facilities that connect to facilities they own. Ind. Code § 8-1-38-9(a)(1) (2024). Plaintiffs contend in this appeal that the Indiana statute violates the dormant commerce clause implied in Article I, Section 8 of the United States Constitution. The district court issued a preliminary injunction barring the Chair and Commissioners of the Indiana Utility Regulatory Commission (collectively, the IURC Commissioners) from enforcing the statute.

The IURC Commissioners and several intervening defendants have appealed that injunction. We vacate the injunction for lack of standing. Plaintiffs have not shown that the injunction is reasonably likely to redress or prevent their feared injuries. As we explain below, the IURC Commissioners have no relevant responsibilities for enforcing the challenged statute. Any genuine redress would have to operate against a non-party, Midcontinent Independent System Operator (MISO), a non-governmental entity that plans, approves, and assigns construction for new interstate transmission projects in Indiana.

Plaintiffs argued to this court and the district court that they have standing because it seemed reasonably likely that, even though MISO is not a party to this lawsuit or the injunction, it would respond to a preliminary injunction against the IURC Commissioners by treating the Indiana law as void and inapplicable. The district court agreed. *LSP Transmission Holdings II, LLC v. Huston*, No. 1:24-CV-01722-TWP-MG, 2024 WL 5008048, at *5–6 (S.D. Ind. Dec. 6, 2024). MISO has now made clear that it need not and will not respond to the preliminary

injunction as plaintiffs and the district court expected, so that theory of standing is not viable.

The dissenting opinion would find standing on a different and novel theory that has not been presented by plaintiffs, was not adopted by the district court, and has not been the subject of any briefing or argument. That theory would treat the injunction as having ordered the IURC to use its regulatory powers to block construction of new facilities approved by MISO and (implicitly) by the Federal Energy Regulatory Commission (FERC). The injunction does not actually say that, though, and no party has interpreted it that way. That interpretation would also likely force a direct federal-state regulatory conflict between FERC and the IURC. Accordingly, we decline to adopt this novel theory and conclude that plaintiffs lack standing to seek this preliminary injunction.

I.   *Statutory and Regulatory Background*

To explain, we begin with background on the respective roles of the IURC, FERC, and MISO, and on rights of first refusal in construction of new interstate transmission facilities. Disagreement over the roles of federal and state electricity regulators is not new. As the electricity industry expanded in the late nineteenth century, States tried to regulate their grids statewide. *General Motors Corp. v. Tracy*, 519 U.S. 278, 289 n.7 (1997), citing Robert L. Swartwout, *Current Utility Regulatory Practice from a Historical Perspective*, 32 Nat. Resources J. 289, 298 (1992). These one-size-fits-all approaches proved "inflexible, impractical, untimely and burdensome on the legislatures," so States left regulation up to local governments. Swartwout, *supra,* at 298.

Some local governments adhered to laissez-faire economic principles in utility management, which led to "predictable and disastrous" consequences: "an initial period of 'wasteful competition,' followed by massive consolidation and the threat of monopolistic pricing." *General Motors*, 519 U.S. at 289 (footnotes omitted), citing Dorner, *Initial Phases of Regulation of the Gas Industry*, in 1 Regulation of the Gas Industry § 2.03 (American Gas Ass'n 1996). Others granted overlapping franchises for utility operation (including, infamously, "45 mostly overlapping franchises … for electric utility operation in Chicago between 1882 and 1905"). Swartwout, *supra,* at 299. Chastened by this experience, States began to provide "a single, local franchise with a business opportunity free of competition …." *General Motors*, 519 U.S. at 290; see also *New York v. FERC*, 535 U.S. 1, 5 (2002) ("In 1935, when the FPA became law, most electricity was sold by vertically integrated utilities that … operated as separate, local monopolies subject to state or local regulation.").

In 1927, the Supreme Court held that States could not regulate certain elements of interstate electricity transmission. *Public Utilities Comm'n of Rhode Island v. Attleboro Steam & Elec. Co.*, 273 U.S. 83, 89–90 (1927), abrogated by *Arkansas Elec. Cooperative Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 393 (1983). The *Attleboro* ruling created an important regulatory gap for a few years by allowing only the federal government to regulate interstate electrical transmission. *New York*, 535 U.S. at 6. Enter Congress in 1935 with the Federal Power Act (FPA or the Act). The Act created the Federal Power Commission (FERC's predecessor) to regulate "the transmission of electric energy in interstate commerce" and "the sale of electric energy at wholesale in interstate commerce." See *id.* at 6–7 (internal quotation marks omitted), quoting 16 U.S.C.

§ 824(b). The Act requires all "rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission" to be "just and reasonable." 16 U.S.C. § 824d(a). It also gives federal regulators the power to correct unlawful practices, including unreasonable rates. *New York*, 535 U.S. at 7, citing 16 U.S.C. § 824e(a).

To carry out that provision, the Act requires each regulated utility to file with FERC its "rates and charges," along with "the classifications, practices, and regulations affecting such rates and charges." 16 U.S.C. § 824d(c). For our purposes, that filing is known as a tariff. See *Morgan Stanley Capital Group Inc. v. Public Utility District No. 1*, 554 U.S. 527, 531 (2008). Utilities may not change their tariffs without giving notice to FERC and to the public, § 824d(d), and FERC has the authority to "suspend the operation" of a changed tariff, subject to some procedural constraints. § 824d(e).

Since the 1990s, FERC has encouraged owners of interstate transmission systems to establish non-governmental entities to plan and operate interstate transmission in their respective regions. See, e.g., *Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities; Recovery of Stranded Costs by Public Utilities and Transmitting Utilities*, 61 Fed. Reg. 21,540-01, at 21,552 (Apr. 24, 1996) ("[W]e see many benefits in ISOs, and encourage utilities to consider ISOs as a tool to meet the demands of the competitive marketplace."); *Regional Transmission Organizations*, 89 FERC ¶ 61,285, 1999 WL 33505505, at *37 (Dec. 20, 1999) ("We conclude that properly structured RTOs throughout the United States can provide significant benefits in the operation of the transmission grid.").

These Regional Transmission Organizations (RTOs) are "voluntary associations of utilities that own electrical transmission lines interconnected to form a regional grid and that agree to delegate operational control of the grid to the association." *Illinois Commerce Comm'n v. FERC*, 721 F.3d 769, 769 (7th Cir. 2013), citing 18 C.F.R. § 35.34(j) & (k)(1)(i). Many are managed by Independent System Operators (ISOs) like MISO, which are non-profit entities that run the RTOs in "a nondiscriminatory manner." *Id.* at 770, quoting *Morgan Stanley*, 554 U.S. at 536–37. As required, MISO has filed with FERC a tariff outlining its rates, charges, and practices affecting such rates and charges. 16 U.S.C. § 824d(c). FERC may review changes to a tariff like MISO's to determine whether the changes are just and reasonable. *Entergy Arkansas, LLC v. FERC*, 109 F.4th 583, 587 (D.C. Cir. 2024), citing 16 U.S.C. § 824d(a). MISO is also responsible for planning expansions and upgrades to the grid in its area. See *Illinois Commerce Comm'n*, 721 F.3d at 770.

Before 2011, as a matter of federal law, when MISO decided that a new interstate transmission facility was needed in some part of its region, the MISO member that served the local area where the facility would be built had a right of first refusal to build the new facility. *MISO Transmission Owners v. FERC*, 819 F.3d 329, 332 (7th Cir. 2016). This was because FERC had approved a provision in MISO's tariff that conferred a *federal* right of first refusal for incumbent transmission owners in MISO's area to build new interstate facilities in their service areas. See *id.*

In 2011, however, FERC changed its policy. FERC's Order 1000 required RTOs and ISOs like MISO to remove provisions from their tariffs that "grant[ed] incumbent transmission

providers a federal right of first refusal to construct transmission facilities selected in a regional transmission plan for purposes of cost allocation." *Transmission Planning & Cost Allocation by Transmission Owning & Operating Public Utilities* (Order 1000), 136 FERC ¶ 61051, at ¶ 253, 2011 WL 2956837, at *81 (July 21, 2011).

That policy change by FERC—abrogating the federal rights of first refusal—was challenged and upheld. See, e.g., *MISO Transmission Owners*, 819 F.3d at 335 ("In summary, FERC's abrogation of the right of first refusal in the MISO Transmission Owners Agreement was lawful."); *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76–77 (D.C. Cir. 2014) (noting that Order 1000 was based on market competition theory and reflected a reasoned decision that rights of first refusal would lead to "unjust" or "unreasonable" practices).

At the same time, however, Order 1000 made crystal clear that it did not "limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities …." Order 1000, 136 FERC ¶ 61,051 at ¶ 227. Taking FERC at its word, MISO amended its tariff to incorporate any applicable state and local right of first refusal laws. MISO Tariff, Attachment FF, ¶ VIII.A.1 (MISO "shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner.").

Several States in the MISO region enacted state rights of first refusal, including Indiana through House Enrolled Act 1420, 2023 Ind. Acts 1444–46 (codified at Ind. Code § 8-1-38-9). See also, e.g., Minn. Stat. § 216B.246, subdiv. 2 (2024); Mich. Comp. Laws § 460.593 (2024). Indiana's right of first refusal law gives an "incumbent electric transmission owner" the right to "construct, own, operate, and maintain" an electricity

transmission facility that has been "approved for construction through a regional transmission organization planning process and that connects to an electric transmission facility owned by the incumbent electric transmission owner." Ind. Code § 8-1-38-9(a)(1) (2024).[1]

II. *Factual and Procedural Background*

In 2022, MISO began planning a new batch of transmission projects as part of its "Long Range Transmission Planning" initiative. It divided those projects into several "tranches," the first of which was approved in July 2022. Tranche 2 was announced in December of that year. In March 2024, MISO released specific Tranche 2.1 plans, including several projects in Indiana.

Plaintiffs filed this lawsuit against the IURC Commissioners in October 2024 challenging Indiana's right of first refusal law on several grounds, focusing most on the dormant commerce clause. Plaintiffs expected the MISO Board to approve the Tranche 2.1 projects at a meeting scheduled for December 10–12, 2024. Plaintiffs also expected that MISO's approval of those projects would result in immediate assignment of construction of the projects to incumbents in accordance with HEA 1420 and MISO's tariff. Plaintiffs sought a preliminary

---

[1] Similar laws have been challenged on dormant commerce clause grounds in two other circuits with different results. See *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020) (upholding Minnesota law against dormant commerce clause challenge); *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022) (reversing dismissal of dormant commerce clause claim); see also *NextEra Energy Capital Holdings, Inc. v. Jackson*, No. 1:19-CV-626-DII, 2024 WL 4660920, at *17 (W.D. Tex. Oct. 28, 2024) (district court opinion on remand, granting judgment on the pleadings for plaintiffs on dormant commerce clause claim).

injunction—but only against the IURC Commissioners—to enjoin the Commissioners from "enforcing Indiana House Enrolled Act 1420 of 2023." Several incumbent transmission owners intervened to defend their rights of first refusal under the Indiana statute. Plaintiffs did not seek injunctive relief against MISO or even name it as a defendant.

The IURC Commissioners challenged plaintiffs' standing to seek an injunction preventing the Commissioners from enforcing the rights of first refusal. Intervenor defendants made related arguments under the preliminary injunction standard. Both the IURC Commissioners and the intervenor defendants argued that the IURC simply does not "enforce" the rights of first refusal, so an injunction running only against the IURC Commissioners could not redress or prevent the injuries that plaintiffs feared.

On December 6—four days before MISO's Board was scheduled to begin its meeting on the Tranche 2.1 projects—the district court issued a preliminary injunction. It found that plaintiffs had standing because "the IURC enforces the rights of first refusal" and concluded that, if it enjoined the IURC from enforcing HEA 1420, MISO would "no longer be permitted to recognize an incumbent's right of first refusal…." *LSP Transmission Holdings II, LLC v. Huston*, No. 1:24-CV-01722-TWP-MG, 2024 WL 5008048, at *5–6 (S.D. Ind. Dec. 6, 2024). The district court also found that plaintiffs were likely to succeed on the merits of their commerce clause challenge, *id.* at *7–9, and that the equities weighed in favor of enjoining enforcement of the law. *Id.* at *9–10.

The IURC Commissioners and the intervening defendants appealed on December 11, seeking a stay of the injunction pending appeal and an administrative stay of the injunction

pending resolution of that motion. This court granted the administrative stay at around 7:30 am Central Time on December 12. Later that morning, MISO approved the Tranche 2.1 projects. That action started a 90-day clock for incumbents in Indiana to notify the IURC whether they intended to exercise their rights of first refusal on those Tranche 2.1 projects. See Ind. Code § 8-1-38-9(c) (2024).

On December 17, this court heard argument on defendants' request for a stay pending appeal. We granted the stay and set argument on the merits of the appeal for January 27, 2025. We also invited MISO to offer its position on "whether (and on what basis, voluntarily or under legal obligation) it would adhere to any court orders or judgments addressing the constitutionality of the right of first refusal" in HEA 1420, and we invited FERC to provide its perspective on "whether the Federal Power Act and its implementing regulations, policies, or directives address the legality and enforceability (under the U.S. Constitution or otherwise) of state law rights of first refusal available to incumbent electric transmission owners."

We thought that order would preserve the status quo until oral argument, but we were wrong. On December 30, plaintiffs moved for reconsideration of the order granting a stay pending appeal, asserting that MISO was going to decide "no later than January 13, 2025" which of the Tranche 2.1 projects in Indiana would be designated for competitive bidding and which would go to incumbents under their rights of first refusal. Plaintiffs also stated their belief that MISO would treat such designations as irreversible. We expedited briefing on the motion to reconsider and ultimately granted it, concluding that the "equitable factors weigh in favor of lifting the stay

and allowing the district court's order preliminarily enjoining the enforcement of House Enrolled Act 1420 to take effect." At that point, however, we had not yet heard from MISO or FERC, the entities closest to the center of this controversy. The parties then filed full briefs on the merits of this appeal. As invited, MISO and FERC both filed amicus briefs.[2]

We held argument on January 27, 2025. We now vacate the preliminary injunction and remand the case to the district court for further proceedings. The relief at issue in this appeal—a preliminary injunction against only the IURC Commissioners—would not redress and is not redressing plaintiffs' anticipated harm. That means plaintiffs lack standing to seek the requested injunction.

III. *Standing for the Preliminary Injunction*

"[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021), citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "[A] plaintiff must demonstrate standing separately for each form of relief sought." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000).

A core tenet of standing doctrine under Article III of the Constitution is the general rule "barring adjudication of generalized grievances more appropriately addressed in the

---

[2] Plaintiffs later filed a motion to respond to MISO's and FERC's amicus briefs. We grant that motion. The tendered response shall be deemed filed, and we have considered that brief as well as the responses during oral argument.

representative branches ….” *Allen v. Wright*, 468 U.S. 737, 751 (1984), abrogated on other grounds by *Lexmark Int’l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 & 127 n.3 (2014) (endorsing principle under Article III). The central problem with plaintiffs’ request for injunctive relief is redressability. As we see it, there are two related issues: whether plaintiffs sued the right defendants and whether plaintiffs sought relief that would likely redress or prevent the harm they fear. We address each in turn.

A.  *The IURC Commissioners*

Plaintiffs believe the rights of first refusal granted under HEA 1420 are unconstitutional. They seek to require MISO to assign the rights to build and operate the Indiana Tranche 2.1 projects using competitive bidding by all interested and qualified bidders. Plaintiffs did not, however, seek any injunctive relief against MISO itself or even name MISO as a defendant.

1.  *The District Court’s Approach to Redressability*

The district court concluded that the requested injunction would likely redress or prevent plaintiffs’ feared injuries: “Because the IURC enforces the rights of first refusal, see Ind. Code § 8-1-2-115, LSP’s alleged injury is traceable to the IURC Defendants. … IURC would no longer be permitted to recognize an incumbent’s right of first refusal, and neither, in turn, would MISO.” *LSP Transmission Holdings II, LLC v. Huston*, 2024 WL 5008048, at *6. The court accordingly issued an injunction against the IURC Commissioners. They were “preliminarily enjoined from enforcing the rights of first refusal of Indiana Code § 8-1-38-9.” The injunction did not and could not declare § 8-1-38-9 unconstitutional or prevent its enforcement more generally. Nor did the injunction purport to affect

IURC's enforcement of any laws other than § 8-1-38-9 or to order the IURC to block construction of any projects that MISO might approve.

On appeal, we have had the benefit of more thorough briefing, as well as a statement from MISO on how it views the interplay among HEA 1420, FERC, and the IURC. We conclude that the district court's preliminary injunction against the IURC Commissioners has not and would not redress or prevent plaintiffs' feared injuries.

This case presents an unusual situation. Plaintiffs and the dissenting opinion insist that a governmental body has powers that the governmental body says it does not have. The IURC Commissioners insist that the IURC has no role in enforcing rights of first refusal under HEA 1420. The IURC Commissioners told us in their brief, for example: "But the named defendants here—IURC's Chairman and Commissioners—do not participate in designating MISO-planned projects. Nor does IURC have any enforcement authority over how MISO conducts those awards." Appellants' Br. at 24; accord, *id.* at 25 ("IURC does not participate in the approval or allocation of MISO-planned projects for any electric transmission owner."). Counsel for the Commissioners also told us at oral argument that even if there were a final judgment declaring HEA 1420 unconstitutional, IURC "wouldn't have any enforcement authority to do anything" to prevent construction consistent with a MISO award. Oral Arg. at 22:45–24:30; 24:10. Based on our review of the statutes, we agree with the IURC's assessment of its own powers.

HEA 1420 vests incumbents with a right to build new transmission projects. See § 8-1-38-9(a). To exercise that right, an incumbent must "give written notice" to the IURC within

90 days of project approval of its intent to construct the new project. § 8-1-38-9(c). If the incumbent notifies the IURC of its intent "not to construct the approved electric transmission facility, another entity may seek to construct [the facility] in accordance with the regional transmission organization planning process and this chapter." *Id.* A constructing incumbent must provide the IURC with a brief description of the construction, the reason for the construction, an estimate of the total cost of the project, and a copy of the rate that it has most recently filed with FERC. § 8-1-38-9(d)(1) & (d)(2). The incumbent must also, "to the extent commercially practicable, use competitively bid engineering, procurement, or construction contracts, as applicable, that meet all the technical, commercial, and other specifications, such as safety performance, required by the incumbent electric transmission owner with respect to the electric transmission facility." § 8-1-38-9(e).

These provisions grant incumbency rights of first refusal, but they do not give the IURC any enforcement authority to police or enforce those rights. Even the subsections of the statute that mention the IURC make clear that the IURC functions only as a notice repository, not as an enforcer of the rights of first refusal. See, e.g., § 8-1-38-9(c) (requiring an incumbent exercising a right of first refusal to "give written notice to the commission" and specifying that if an incumbent declines that right, any other aspiring constructor must go to the RTO for approval); § 8-1-38-9(d) (requiring a constructing incumbent to provide the IURC with information about the construction project).

In sum, HEA 1420 requires incumbents exercising rights of first refusal to file notice with the IURC at several different points during the construction project. That is all HEA 1420

has to say about the IURC. If the incumbent does not wish to build the project, HEA 1420 directs non-incumbents to seek construction approval from the RTO "in accordance with the regional transmission organization planning process and this chapter." § 8-1-38-9(c). No provision gives the IURC any responsibilities toward RTOs' or ISOs' decisions assigning projects, whether based on the statutory rights of first refusal or any other considerations. Enjoining the IURC Commissioners from enforcing HEA 1420 therefore cannot redress or prevent plaintiffs' harm.

### 2. *The Dissenting Approach to Redressability*

The dissenting opinion offers a different perspective. Relying on the IURC's general power to enforce public utility laws in Indiana Code § 8-1-2-115, the dissenting opinion treats the preliminary injunction as requiring the IURC to use its statutory powers to block construction when an incumbent seeks to build a project assigned by MISO in reliance upon the HEA 1420 right of first refusal. The preliminary injunction does not purport to do that, and neither plaintiffs, defendants, intervenor-defendants, nor the district court have interpreted the preliminary injunction that way.

That fact alone counsels against consideration of the dissenting theory here. In C*alifornia v. Texas*, 593 U.S. 659 (2021), the Supreme Court faced similar standing problems in a challenge to the Affordable Care Act. Justice Thomas wrote a persuasive concurring opinion explaining why resolving a case based on a theory of standing that connects an unenforceable provision to other statutory provisions, without briefing from the parties, is not prudent. "This lack of legal development is particularly significant because standing-through-inseverability—assuming it is a legitimate theory of standing—is

fundamentally a merits-like exercise that requires courts to apply ordinary principles of statutory interpretation to determine if it is at least 'arguable' that a statute links the lawfulness of one provision to the lawfulness of another. Thus, a failure to develop a standing-through-inseverability argument poses a significant obstacle to review." *Id.* at 684 n.2 (Thomas, J., concurring) (internal citations omitted).

There are good reasons why plaintiffs and the district court have not pursued the dissenting theory. Under the dissenting opinion's approach, the district court would have ordered (or actually did order) the IURC to block construction of interstate transmission projects approved and assigned by MISO. Those projects lie squarely in the heartland of FERC's jurisdictional territory. That approach would force the IURC into a power struggle with FERC over whether legitimately assigned and important projects may be constructed—essentially obliging the State officials to block construction projects approved by federal authorities.

The dissenting opinion would in effect conscript the IURC to enforce the dormant commerce clause rather than carry out its more general duties to enforce Indiana public utility laws. And it would do so to accommodate plaintiffs' tactical choice not to sue the entity that is actually complying with HEA 1420, which is MISO, acting under its FERC-approved tariff.

There is another problem with the dissenting approach. It assumes that plaintiffs have standing to seek an injunction that would employ the rest of Indiana public utility law to prevent enforcement of HEA 1420. But none of plaintiffs' claimed or feared harms come from any provisions of Indiana law other than HEA 1420. This creates a traceability problem linked to severability.

In *California v. Texas*, the Supreme Court rejected a similar argument that a plaintiff had standing when his alleged harm came from an unenforceable provision, even when relief could have operated against other statutory provisions. 593 U.S. 659. In that case, several States and individuals challenged the Affordable Care Act's requirement that individuals obtain health insurance coverage. However, amendments to the Affordable Care Act set the penalty for failure to obtain health coverage at $0 (effectively nullifying any enforcement authority). *Id.* at 667. The Supreme Court held that plaintiffs accordingly lacked standing. While the Affordable Care Act told individuals to obtain minimum coverage, it had "no means of enforcement. … Because of this, there is no possible Government action that is causally connected to the plaintiffs' injury…." *Id.* at 669. The State plaintiffs in that case nonetheless asserted that they had standing because the individual mandate "also causes them to incur additional costs directly" by requiring them to provide information to insurance beneficiaries and the IRS. *Id.* at 678.

The Supreme Court rejected this argument: "The problem with these claims, however, is that other provisions of Act, not the minimum essential coverage provision, impose these other requirements. Nothing in the text of these form provisions suggests that they would not operate without [the allegedly unconstitutional provision]." *Id.* The Court explained why this approach failed to confer Article III standing: "To show that the [individual mandate] is unconstitutional would not show that enforcement of any of these other provisions violates the Constitution. … The Government's conduct in question is therefore not 'fairly traceable' to enforcement of

the 'allegedly unlawful' provision of which the plaintiffs complain ...." *Id.* at 679, quoting *Allen*, 468 U.S. at 751.[3]

So too here. Plaintiffs contend that only HEA 1420 is unconstitutional. As in *California*, the injunction bars the named defendants from enforcing the allegedly unconstitutional provision, but they do nothing to enforce that provision. The dissenting opinion would try to redress the injury allegedly caused by that provision by enjoining the IURC from exercising duties imposed by other statutory provisions. But plaintiffs do not allege that "enforcement of any of these other provisions violates the Constitution." *California*, 593 U.S. at 679. As a result, plaintiffs have not shown that the IURC's other conduct is "fairly traceable" to the allegedly unconstitutional action, and they cannot manufacture standing by seeking redress through an injunction against enforcement of the other (constitutional) statutory provisions. *Id.*; see also *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."); *Davis v. Colerain Township, Ohio*, 51 F.4th 164, 171 (6th Cir. 2022) ("[W]hen a plaintiff has been injured by one part of a law, the plaintiff cannot invoke that injury to challenge other parts of the law that have done nothing to the plaintiff."), citing *California*, 593 U.S. at 678–79; *National Federation of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202, 210 (5th

---

[3] The dissenting opinion in *California* adopted the same view of standing—and cited some of the same cases, including *Seila Law LLC v. CFPB*, 591 U.S. 197, 211 (2020)—as the dissenting opinion in this case. See *California*, 593 U.S. at 698–703 (Alito, J., dissenting). Those arguments did not carry the day in that case and should not do so here.

Cir. 2011) (plaintiffs did not allege injury from one statutory provision, so—despite "limits imposed on them" by another statutory provision—they did not have standing).

The dissenting opinion's demand that the IURC act to block MISO-approved projects runs contrary to both federal precedent and Indiana law on severability and redressability. See *California*, 593 U.S. at 678 ("The problem with these claims, however, is that other provisions of Act, not the minimum essential coverage provision, impose these other requirements. Nothing in the text of these form provisions suggests that they would not operate without [the challenged provision]."). It is well-established that a court should "refrain from invalidating more of the statute than is necessary…. '[W]henever an act of Congress contains unobjectionable provisions separable from those found to be unconstitutional, it is the duty of this court to so declare, and to maintain the act in so far as it is valid.'" *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987) (alterations in original), quoting *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984) (plurality opinion).[4]

HEA 1420 is clearly severable from the other provisions of Indiana law dealing with utility regulation. First, contrary to the dissenting opinion, Indiana law provides a general "firewall" separating unconstitutional provisions from other statutory components: "If any provision of this Code as now

---

[4] Indiana courts also follow this approach to severability. See, e.g., *Paul Stieler Enterprises, Inc. v. City of Evansville*, 2 N.E.3d 1269, 1278–79 (Ind. 2014), citing *Dorchy v. Kansas*, 264 U.S. 286, 289–90 (1924); *Ettinger v. Studevent*, 38 N.E.2d 1000, 1007 (Ind. 1942) ("Where the legislature attempts to do several things one of which is invalid it may be discarded if the remainder of the act is workable and in no way dependent upon the invalid portion.").

or later amended or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions that can be given effect without the invalid provision or application." Ind. Code § 1-1-1-8(a); cf. post at 38. Moreover, the other provisions of Chapter 38—which impose the IURC's statutory obligations—were in place and effective well before HEA 1420 took effect in 2023. See, e.g., 2013 Ind. Acts 1767–1770 (enacting other provisions of Chapter 38). The provisions of Chapter 2 cited for the IURC's broad authority over public utilities have been in effect since at least the 1970s and 1980s, with many dating from the early 20th century. See, e.g., 1913 Ind. Acts 167–214 (creating the IURC's predecessor), 177 (vesting commission with authority to set rates); 1979 Ind. Acts 382 (defining scope of Commission's authority to regulate relations between utilities and the public); 1984 Ind. Acts 678–743 (overhauling Chapter 2 and the powers of the Commission); 2017 Ind. Acts 3736–3751 (amending certain elements of the IURC's authority over public utility rate-setting).

Those older provisions of Indiana public utility law are easily enforceable whether or not HEA 1420 is in effect; they do not depend and have never depended on the later-enacted HEA 1420. See *Paul Stieler Enterprises*, 2 N.E.3d at 1278–79. This serves as a firewall preventing courts from upending the entire Indiana utility code upon finding one provision unconstitutional. Cf. *California*, 593 U.S. at 679 (rejecting effort to overturn entire Affordable Care Act based on challenge to one unenforceable provision). HEA 1420's relative brevity and recent enactment show its limited role in Indiana utility law generally. Our analysis of redressability should recognize that reality.

The IURC's minimal role under HEA 1420—receiving notices that incumbents are exercising rights of first refusal—could not cause plaintiffs' feared harm. Instead, plaintiffs' feared irreparable injury would result "from the independent action of some third party not before the court." *Allen*, 468 U.S. at 757 (internal quotation marks omitted), quoting *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 42 (1976). That means plaintiffs lack standing.

We do not suggest that MISO's actions are independent of HEA 1420. Its FERC-approved tariff requires MISO to comply with HEA 1420, after all. But MISO's actions on these projects are independent of the IURC Commissioners, who are the only parties subject to this preliminary injunction. Plaintiffs chose not to sue and seek relief against MISO. Because the IURC simply has no statutory duty to *enforce* the rights of first refusal established under HEA 1420, the preliminary injunction has not—and could not be expected to—redress the harm plaintiffs fear. As a result of plaintiffs' choice not to name MISO as a defendant, redressability is missing here.[5]

B.  *Preliminary Injunction*

Plaintiffs argue that even if the IURC is not directly involved in enforcing Indiana's rights of first refusal, the preliminary injunction against enforcement of HEA 1420 should render the law no longer "applicable" under the language of MISO's tariff, thereby preventing MISO from awarding

---

[5] The dissenting opinion submits that uncertainty regarding how to properly sue MISO makes the IURC a proper defendant. Post at 43. Respectfully, the possible merits of a different hypothetical lawsuit against an entity not before the court have no bearing on whether plaintiffs have standing in this case.

contracts on the basis of that law. As noted, the district court adopted this reasoning. *LSP Transmission Holdings*, 2024 WL 5008048, at *6.

We see three problems with plaintiffs' reasoning. First, the well-understood limits of a preliminary injunction support defendants' position that the injunction does not change the applicability of the law in question to non-parties. As the Supreme Court reminded us just last month: "Preliminary injunctions, however, do not conclusively resolve legal disputes." *Lackey v. Stinnie*, 604 U.S. —, —, No. 23-621, slip op. at 6, 2025 WL 594737, at *4 (Feb. 25, 2025). When deciding whether to issue a preliminary injunction, a court must determine whether the movant is "likely to succeed on the merits…." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Based on that early assessment, a court may determine whether State officials ought to be able to enforce the law pending further proceedings. But a preliminary injunction is "not a preliminary adjudication on the ultimate merits: it is an equitable device for preserving rights pending final resolution of the dispute." *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984); accord, *Lackey*, 604 U.S. at —, slip op. at 6, 2025 WL 594737, at *4.

As we have explained, the difference between a preliminary injunction and a permanent injunction is meaningful: "in granting or denying a *preliminary* injunction, the court [decides] only the plaintiffs' *likelihood of success on the merits*, whereas in granting or denying a *permanent* injunction, it [decides] their *actual success on the merits*." *Lacy v. Cook County*, 897 F.3d 847, 859 (7th Cir. 2018), citing *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 782 (7th Cir. 2011); accord, *Monroe v. Bowman*, 122 F.4th 688, 690–91 (7th Cir. 2024) (district

court could not retroactively convert preliminary injunction into permanent injunction). "In other words, only a hearing on *permanent* injunctive relief would result in conclusive findings …; any judicial findings made in deciding *preliminary* relief would remain subject to change." *Lacy*, 897 F.3d at 859, citing *Michigan*, 667 F.3d at 782. That is true between the parties to the case in which a preliminary injunction is issued, and a preliminary injunction ordinarily has no bearing on whether a law remains "applicable" or even "in effect" as applied to persons and entities not before the issuing court, like MISO in this case.[6]

Second, MISO does not view itself as bound by the injunction, and as a matter of law it is not bound. In its amicus brief, MISO noted that the district court's preliminary injunction "does not direct MISO to take any action, nor does it prohibit MISO from taking any action," and MISO explained its view that the preliminary injunction was not a final adjudication of

---

[6] For this reason, plaintiffs are incorrect in asserting that a favorable ruling in this appeal would remove "an unlawful barrier" to their participation in the interstate transmission market. A favorable ruling would not "remove" such a barrier at all. It would instead only (1) perhaps prevent the IURC from receiving notices from incumbents intending to exercise rights of first refusal and (2) indicate our belief that plaintiffs would be "likely" to prevail in an ultimate trial on the merits. For the reasons explained above, the statute's continued legitimacy absent a final judgment distinguishes this situation from the cases cited in plaintiffs' brief. See, e.g., *Reed v. Goertz*, 598 U.S. 230, 234 (2023) (plaintiff had standing to challenge State DNA testing procedures because prosecutor relied on those procedures to deny DNA testing, making it "substantially likely" that favorable decision would result in relief); *DIRECTV, Inc. v. F.C.C.*, 110 F.3d 816, 829–30 (D.C. Cir. 1997) (DIRECTV had standing to challenge rule requiring it to divest certain holdings upon winning an auction because rule was an allegedly "unlawful barrier" to its participation in the auction).

the statute's constitutionality. MISO's position is that the language in its tariff—which obliges it to "comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner"—does not require it to comply with a preliminary injunction against another entity's supposed enforcement of a right of first refusal statute.

Seeking to remedy this problem, after oral argument in this appeal, plaintiffs filed a complaint with FERC asserting that MISO is violating its tariff by continuing to assign projects based on HEA 1420 despite issuance of the preliminary injunction. But this maneuver proves defendants' point: the preliminary injunction will not redress or prevent the harm plaintiffs fear absent an uncertain result in other proceedings.[7]

---

[7] The dissenting opinion implies that plaintiffs' constitutional challenge to HEA 1420 simply *must* be justiciable. Post at 42. The position is not persuasive for two reasons. First, the Supreme Court has repeatedly rejected such arguments when a plaintiff otherwise fails to show standing. E.g., *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 396 (2024) ("The 'assumption' that if these plaintiffs lack 'standing to sue, no one would have standing, is not a reason to find standing.' Rather, some issues may be left to the political and democratic processes…." (internal citations omitted)), quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974); *Kurowski v. Krajewski*, 848 F.2d 767, 774 (7th Cir. 1988) ("In some cases no one will have standing to sue."). Second, and more specifically, plaintiffs can raise their constitutional issues in proceedings before FERC, whose decisions are subject to review by Article III courts. See 16 U.S.C. § 824e(a) (FERC shall resolve challenges to practices affecting the rates by order); 16 U.S.C. § 825l(b) (any party aggrieved by a FERC order may "obtain a review of such order" in the D.C. Circuit or geographic circuit); cf. *United States v. Richardson*, 418 U.S. 166, 179 (1974) ("In a very real sense, the absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the

Plaintiffs argue that a plaintiff can establish redressability and therefore standing when a court's order is likely to make third parties act in a particular way that would redress the plaintiff's harm. Appellees' Br. at 24–27, first citing *Skyline Wesleyan Church v. California. Dep't of Managed Health Care*, 968 F.3d 738, 742 (9th Cir. 2020), and then citing *Bennett v. Spear*, 520 U.S. 154, 169 (1997). That's true as a general rule. But given MISO's legally correct view that it is not bound by this preliminary injunction because it is not a party, it is not likely that the injunction would cause MISO to act in a way that would prevent or redress plaintiffs' feared injuries. The dissenting opinion is correct in saying "it is a bedrock principle that a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" Post at 41, quoting *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). [8]

political process. … Lack of standing within the narrow confines of Art. III jurisdiction does not impair the right to assert his views in the political forum or at the polls.").

[8] Our view is also consistent with FERC's statement in unrelated proceedings that a developer's "rights to own, develop, and construct [a] Project" under an Iowa right of first refusal statute remained "uncertain" notwithstanding an Iowa Supreme Court preliminary injunction against enforcement of that statute. *ITC Midwest, LLC*, 185 FERC ¶ 61,123 at ¶¶ 34-35, 2023 WL 8001300, at *7–8 (Nov. 16, 2023) ("[U]nless and until the Iowa ROFR Statute is ruled unconstitutional, the Project was properly assigned to ITC Midwest under MISO's Tariff."); see also *LS Power Midcontinent, LLC v. State*, 988 N.W.2d 316, 322 (Iowa 2023) (underlying Iowa Supreme Court case, reversing court of appeals' decision on standing and granting temporary injunction to stay enforcement of Iowa right of first refusal law pending litigation of merits of state constitutional challenge). To be sure, that FERC decision arose in a different posture than this case. The dispute was whether costs incurred by a constructing utility "after the Iowa Supreme Court enjoined the ROFR statu[t]e's effectiveness" would be

Third, the plain terms of this particular injunction show the limited scope of relief that plaintiffs sought here. By naming only the IURC Commissioners as defendants, plaintiffs ensured that the district court's order could not operate against MISO directly. See *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021) ("[A] federal injunction prevents state officials from enforcing the challenged statute, regulation, or agency action in the future based on its incompatibility with federal law. An injunction operates on the enjoined officials; the law, regulation, or agency action remains on the books …."); *United States v. Kirschenbaum*, 156 F.3d 784, 794 (7th Cir. 1998) ("A district court may not enjoin non-parties who are neither acting in concert with the enjoined party nor are in the capacity of agents, employees, officers, etc. of the enjoined party"), first citing Fed. R. Civ. P. 65(d), and then citing *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 12 (1945). MISO is the entity that is responsible for "assigning" contracts, as plaintiffs made clear when they petitioned for reconsideration asserting their fear of irreparable harm resulting *from MISO assignments*.[9]

---

deemed per se "imprudent" and therefore non-recoverable. See *ITC Midwest*, 185 FERC ¶ 61,123, at ¶ 25. But it shows nonetheless that FERC does not view a preliminary injunction against state regulatory enforcement of a state right of first refusal law as a conclusive determination that project assignment is invalid.

[9] Preliminary injunctions may operate against non-parties who are officers, agents, servants, employees, or attorneys of the enjoined parties or are otherwise in active concert or participation with them. See Fed. R. Civ. P. 65(d)(2). None of those circumstances are present here. Plaintiffs do not argue that MISO is acting in concert or participation with the IURC. Instead, MISO is continuing to comply with HEA 1420 based on the independent legal effect of its FERC-approved tariff.

This outcome is also consistent with congressional direction on electricity regulation. The Federal Power Act specifies that "electric energy shall be held to be transmitted in interstate commerce"—and therefore subject to FERC regulation— "if transmitted from a State and consumed at any point outside thereof …." 16 U.S.C. § 824(c). The Supreme Court has explained that this text "unambiguously authorizes FERC to assert jurisdiction over" interstate transmission. *New York v. FERC*, 535 U.S. 1, 19–20; *id.* at 22 ("[T]he FPA contains … 'a clear and specific grant of jurisdiction' to FERC over interstate transmissions …."), quoting *FPC v. Southern California Edison Co.*, 376 U.S. 205, 215 (1964).

The rights of first refusal challenged in this appeal passed through two separate federal checkpoints—subject to extensive FERC oversight—before taking effect. First, in Order 1000, FERC amended its cost allocation requirements for public utility transmission providers to remove federal rights of first refusal, but FERC explicitly allowed States to grant their own. See Order 1000, 136 FERC ¶ 61,051 at ¶ 227 (removing federal right of first refusal to "provide flexibility for public utility transmission providers in each region to propose … how best to address participation by nonincumbents" but noting that "nothing in this Final Rule is intended to limit, preempt, or otherwise affect state or local laws or regulations with respect to construction of transmission facilities, including but not limited to authority over siting or permitting of transmission facilities.").[10]

---

[10] We borrow the phrase "federal checkpoints" from *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 155 (1982), where the Supreme Court found that a federal agency's approval of an Indian tribe's arguably discriminatory tax meant the tax did not violate the Indian commerce clause. See also

Second, and more specifically, FERC approved MISO's tariff, which provides that MISO "shall comply with any Applicable Laws and Regulations granting a right of first refusal to a Transmission Owner." MISO Tariff, Attachment FF, ¶ VIII.A.1. MISO's tariff thus adopts HEA 1420, and FERC's approval of the tariff gave the tariff the effect of federal law. FERC had the power to reject that proposed term if it thought its application would not be "just and reasonable." See 16 U.S.C. § 824d(a)–(d). It decided to leave that question to the States. Moreover, as noted above, there are congressionally established paths for aggrieved parties to seek review of that policy decision by both FERC and federal courts of appeals. See, e.g., 16 U.S.C. § 824e(a); 16 U.S.C. § 825*l*(b).

Early in this case, plaintiffs relied on MISO's statement in an amicus brief to the Iowa Supreme Court that "no [rights of first refusal] will be accorded to Iowa projects" subsequently assigned by MISO after an Iowa trial court entered a final judgment and permanent injunction against the Iowa law. Plaintiffs here argued—and the district court agreed—that the Iowa amicus brief showed that MISO would similarly refrain from assigning projects based on HEA 1420 if the district court issued a preliminary injunction in this case against IURC enforcement of it pending a final judgment on the merits. *LSP Transmission Holdings*, 2024 WL 5008048, at *6 (district court order citing that amicus brief in Iowa). Plaintiffs dropped that argument in their merits brief to this court. There were two good reasons to do so.

---

*White v. Massachusetts Council of Const. Employers, Inc.*, 460 U.S. 204, 213 & 213 n.11 (1983) (federal agency approval of city policy favoring local contractors meant policy did not violate dormant commerce clause).

First, as explained above, MISO has made clear *in this court* that it does not view itself as bound by the preliminary injunction directed only against the IURC Commissioners. Second, the fact that the Iowa state trial court had issued a final judgment and permanent injunction adjudicating that the Iowa right of first refusal was unconstitutional under state law made that case critically different from this one. MISO's representation in Iowa that it would be bound by that final judgment is understandable: such a judgment can deprive the statute of effect, unlike a preliminary injunction that simply prevents enforcement by a particular entity (in this case the IURC) against particular plaintiffs. See *GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 369–70 (7th Cir. 2019) ("After a court holds that a statute or ordinance is unconstitutional, that legislation is void.… But the court's ruling that the law is invalid is the crucial trigger for voiding it.") (internal citations omitted).

The dissenting opinion suggests that this opinion is internally inconsistent because it implies that plaintiffs might have standing to seek a permanent injunction but adopts reasoning that would deny them standing for a permanent injunction. See post at 40–41. To be clear, we do not intend to imply any conclusion about whether plaintiffs would have standing to seek a permanent injunction against the IURC Commissioners under a theory that MISO would feel itself bound by a final judgment treating HEA 1420 as unconstitutional. It is not impossible, but it is difficult, to establish standing based on a prediction about how a non-party is likely to respond to a court decision. Here is what the Supreme Court said in rejecting such an attempt in *California v. Texas*:

> We have said that, where a causal relation between injury and challenged action depends upon the decision of an independent third party (here an individual's decision to enroll in, say, Medicaid), "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish[.]" *Lujan*, 504 U.S., at 562 (quoting *Allen*, 468 U.S., at 758); see also [*Clapper v. Amnesty International USA*, 568 U.S. 398, 414 (2013)] (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). To satisfy that burden, the plaintiff must show at the least "that third parties will likely react in predictable ways." *Department of Commerce v. New York*, 588 U. S. 752, 768 (2019). And, "at the summary judgment stage, such a party can no longer rest on … mere allegations, but must set forth … specific facts" that adequately support their contention. *Clapper*, 568 U.S., at 411–412 (internal quotation marks omitted). The state plaintiffs have not done so.

593 U.S. at 675.

Principles of judicial restraint call for us to focus on the only order on appeal: the preliminary injunction. MISO has told us and shown us that the preliminary injunction against the IURC Commissioners is not affecting its actions. Standing to seek permanent injunctive relief is not before this court in this appeal. In addition, developments before FERC or decisions by MISO may affect future proceedings before the district court. We cannot and should not try to determine

plaintiffs' standing to seek a permanent injunction when so much is still subject to change.

In sum, plaintiffs lacked standing to seek the preliminary injunction here because the injunction against the IURC did not oblige MISO—the entity actually responsible for assigning these projects and for the harm plaintiffs fear—to act in any particular way. Nor did the injunction prompt MISO to modify its actions. The preliminary injunction is hereby VACATED and the case is REMANDED to the district court for further proceedings consistent with this opinion.

SCUDDER, *Circuit Judge*, dissenting. LSP Transmission Holdings seeks to build electric transmission lines in Indiana but is unable to compete for these projects because of the State's House Enrolled Act 1420. The statute affords "incumbents," companies who already own transmission lines in Indiana, a right of first refusal. As its name implies, the right gives existing transmission providers the option to construct any new projects that connect to their existing lines without having to bid or otherwise compete for those projects.

LSP and affiliated companies invoked 42 U.S.C. § 1983 and brought suit against the Chair and Commissioners of the Indiana Utility Regulatory Commission. They claim HEA 1420 violates the Constitution by discriminating against interstate commerce and sought and received preliminary injunctive relief before the district court. The Commissioners now appeal, joined by several companies that qualify as incumbents under HEA 1420 who intervened to defend the Indiana statute.

I would affirm. LSP not only has standing but also has demonstrated a likelihood of success on the merits because HEA 1420 facially discriminates against interstate commerce and Congress has not clearly authorized that discrimination. The balance of equities also weighs in favor of injunctive relief.

**I**

Article III's Case or Controversy limitation makes LSP's standing the necessary and proper beginning point. At the preliminary injunction stage, the plaintiffs must make a "clear showing" that they are "'likely' to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008)). LSP clears this modest hurdle.

A

Article III standing doctrine requires LSP to make the threefold showing that it "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

LSP alleges that HEA 1420 inflicts commercial injury—in violation of the dormant Commerce Clause—by depriving the company of the ability to compete on equal terms for transmission projects in Indiana. Evaluating this allegation benefits from knowing more about the Indiana statute.

Section 8-1-38-9(a) provides an "incumbent electric transmission owner" with the "right to construct, own, operate, and maintain" not only an electric transmission facility "that connects to an electric transmission facility owned by the incumbent electric transmission owner," but also "[u]pgrades to an existing electric transmission facility owned by the incumbent." Ind. Code § 8-1-38-9(a). The statute defines "incumbent electric transmission owner" as a "public utility that owns, operates, and maintains an electric transmission facility in whole or in part in Indiana." *Id.* § 8-1-38-2.

For a project to trigger a right of first refusal, a regional transmission organization, here the Midcontinent Independent System Operator (MISO), must approve it. See *id.* § 8-1-38-9(a). And because the right is limited to projects approved through MISO's planning process, HEA 1420 only regulates

transmission lines that connect to the *interstate* electric grid—even if an individual project is confined within the state borders of Indiana.

HEA 1420 gives incumbents first dibs to construct qualifying projects. A non-incumbent, by contrast, is only permitted to compete for transmission projects when the incumbent provides the Commission notice that it does not intend to exercise its right of first refusal. See *id.* § 8-1-38-9(c).

LSP's complaint named the Commissioners of the Indiana Utility Regulatory Commission as defendants and sought declaratory relief that Indiana Code § 8-1-38-9, as amended by HEA 1420, is unconstitutional and an order enjoining the Commissioners from enforcing the statute. In granting LSP's motion for a preliminary injunction, the district court enjoined the "Commissioners of the Indiana Utility Regulatory Commission, their agents, servants, and employees, and persons acting in concert or participation with them" from "enforcing the rights of first refusal of Indiana Code § 8-1-38-9."

Returning, then, to the requirements of Article III standing, LSP seeks to bid on several transmission projects in Indiana but cannot do so unless the incumbents decline to exercise their statutory right of first refusal. The "inability to compete on an equal footing in the bidding process," the Supreme Court has recognized, satisfies the injury-in-fact requirement. *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); see also *All. for Clean Coal v. Miller*, 44 F.3d 591, 594 (7th Cir. 1995) (applying *City of Jacksonville* in the dormant Commerce Clause context and finding the inability to "compete on an equal footing in interstate commerce" a sufficient injury). Indeed, the panel majority does not dispute that the injury-in-fact requirement is met

here. I too have little trouble concluding that LSP is likely to suffer a concrete and actual injury by losing the ability to compete for certain transmission projects because of HEA 1420.

From there the questions are whether that injury is fairly traceable to the Commissioners and capable of being redressed through a favorable judicial decision. Causation and redressability, the Supreme Court has emphasized, are often "flip sides of the same coin." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381.

Every indication in Indiana law is that the Commission, in the words of HEA 1420, has the power to prevent an incumbent from being able to "construct, own, operate, and maintain" an electric transmission project in Indiana awarded pursuant to a right of first refusal. Ind. Code § 8-1-38-9(a). The Indiana General Assembly has expressly charged the Utility Regulatory Commission with the power and duty to "enforce … all … laws[] relating to public utilities." *Id.* § 8-1-2-115. There is no doubt that HEA 1420 is such a law. Its right of first refusal is codified in the title of the Indiana Code governing utilities. And to qualify as an "incumbent" under the statute one must be "a *public utility* that owns, operates, and maintains an electric transmission facility in whole or in part in Indiana." *Id.* § 8-1-38-2 (emphasis added). The Commissioners thus "possess[]" overarching "enforcement authority" that "a federal court might enjoin [them] from exercising." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 43 (2021).

Everyone agrees that the Commission is the regulatory agency with authority over public utilities in Indiana.

Everyone agrees that HEA 1420 is a law "relating to public utilities." And everyone agrees that, when an incumbent is awarded a transmission project pursuant to HEA 1420, moving forward with that project will necessarily involve activity in Indiana. It defies belief that the Indiana General Assembly vested the Commission with broad enforcement authority but the Commissioners are nevertheless powerless to impose any limitation on a utility company's ability to construct, own, operate, or maintain electric transmission facilities within the State. To adopt that view is to conclude that Indiana law does not mean what it says.

It is inconceivable that the named defendants could not give effect to the district court's injunction—prohibiting them from enforcing the right of first refusal pursuant to a statute that the court has declared likely violates the dormant Commerce Clause. Because the preliminary injunction denies incumbents the right that HEA 1420 provides (constructing, owning, operating, and maintaining a transmission facility without a competitive bidding process), it follows that LSP's injury (the inability to compete on equal terms) is redressable by a federal court order.

B

The Commissioners and panel majority press a different analysis. They emphasize that it is MISO—not the Commission—who shoulders responsibility for assigning a transmission project to an incumbent in accordance with HEA 1420. And, they continue, the Commission has no authority over MISO. While these observations may be accurate, they are incomplete and do not resolve the standing question before us.

Whether LSP has Article III standing does not turn on whether the Commissioners have authority to assign transmission projects or direct MISO, a non-party, to do anything. All the ink the majority spills over MISO's role in the assignment process is neither here nor there—non-responsive, in my respectful view, to the central issue: whether the Commission itself has the power to prevent an incumbent from constructing, owning, operating, or maintaining an electric transmission facility in the State of Indiana. Indiana law tells us it does. By its terms, § 8-1-2-115 grants the Commission general enforcement authority over all laws relating to public utilities. And we should take the Indiana General Assembly at its word—rather than acquiesce in the agency's understanding of its own statutory authority.

The panel opinion portrays this theory of standing as "novel." Op. at 3. But there is nothing novel about discerning the scope of an agency's administrative authority by interpreting the plain language of the statute defining its powers of enforcement. Nor is there any meaningful difference between my analysis and the district court's. As applied here, the Indiana legislature gave the Commission authority to enforce the statute that causes LSP's alleged harm.

The majority's error stems from reading Indiana law with too narrow a focus, looking only to the immediate provision containing the right of first refusal and, as a consequence, leading the panel to conclude the requirement that incumbents provide the Commission with notice of their intent to exercise the right is "all HEA 1420 has to say about the IURC." Op. at 14–15. But § 8-1-38-9, which houses the right of first refusal, is one provision within the broader Indiana Utility Code—a complex regulatory scheme made up of over 70

chapters and more than 1,000 separate sections. And I see no indication that the Indiana General Assembly sought to erect an interior firewall around HEA 1420, neither separating it from the rest of the Code nor stripping the Commission of its "broad authority over public utilities." Op. at 20.

The majority reaches the opposite conclusion by analyzing whether HEA 1420 is "severable from the other provisions of Indiana law dealing with utility regulation." Op. at 19. But the severability analysis it employs is not one the law knows or recognizes.

The Supreme Court has described severability as a question of the proper remedy for constitutional violations. See, e.g., *Seila L. LLC v. CFPB*, 591 U.S. 197, 232 (2020); *NFIB v. Sebelius*, 567 U.S. 519, 585–88 (2012); *United States v. Booker*, 543 U.S. 220, 245 (2005). Severability doctrine comes into play only *after* a court has decided the constitutional merits. But, in resolving this appeal on standing grounds, the majority never reaches the merits of LSP's constitutional challenge to HEA 1420. So it is not at all clear why the majority reaches for the severability doctrine to answer a threshold question of Article III standing.

The clear design of the majority's severability analysis is to isolate HEA 1420 from the rest of the Indiana Utility Code and avoid the Indiana General Assembly's delegation of general enforcement authority to the Commission. But whether the right of first refusal is indeed severable in no way answers or even informs the Article III standing inquiry: whether the Commissioners can redress LSP's alleged injury. Nor does any canon of construction I know of consider a statute's "relative brevity and recent enactment," Op. at 20, to conclude, in categorical terms, that the rest of the statutory scheme is

extraneous and, by extension here, irrelevant to a proper Article III standing analysis.

HEA 1420 does not speak to the Commissioners' power to enforce the right of first refusal. Contra *Jackson*, 595 U.S. at 35–36, 43–44 (citing Tex. Health & Safety Code Ann. § 171.207(a)) (concluding that plaintiffs lacked standing to sue the Attorney General of Texas where the state statute expressly divested state officials of enforcement authority). So resolving what authority these named defendants have under Indiana law requires looking outside the four corners of the provision providing the right of first refusal.

All I am saying is we must read HEA 1420 in "context" and "with a view to [its] place in the overall statutory scheme." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022) (citation omitted). Against this backdrop, the grant of general enforcement authority belies the majority's claim that the Commission—the state regulatory body tasked with overseeing public utilities—is merely a maildrop, functioning "only as a notice repository, not as an enforcer of the rights of first refusal." Op. at 14. The plain language of § 8-1-2-115 compels a clear conclusion: the Commission can redress the harm imposed by an unconstitutional statute that it has the power to enforce.

The majority doubles down on its error by the way it analyzes the harm HEA 1420 inflicts upon LSP. The panel opinion narrowly focuses on MISO's "assignment" of a transmission project to an incumbent and disregards the steps in the process that will follow. Whatever it means to be assigned a project, this is only the first step of a years-long venture that will culminate in an incumbent constructing and operating new transmission lines in Indiana. But LSP does not merely want

to be awarded a project: the company wants to reap the financial benefit of that project through construction and, ultimately, operation of the transmission line within the State.

The district court's preliminary injunction properly accounts for this. By its terms, its scope extends beyond the act of assigning a transmission project to an incumbent—prohibiting the Commissioners instead from more generally "enforcing the rights of first refusal" under Indiana law. And remember that the General Assembly defined the scope of that right to "construct, own, operate, and maintain" certain electric transmission facilities, Ind. Code § 8-1-38-9(a), not merely to be assigned such a project.

Consider for a moment what the majority opinion does not say. Nowhere does the panel conclude that LSP lacks Article III standing to seek a permanent injunction. In fact the majority takes pains to disavow that conclusion and contends the question remains open. See Op. at 29–31. But ask yourself what could possibly happen on remand that would allow LSP to seek permanent injunctive relief where it lacked standing to seek preliminary injunctive relief. The clear answer is, in a word, nothing.

The dormant Commerce Clause claim, the named defendants, and the Commission's authority are not subject to change based on any fact-finding that may occur in the district court. To the contrary, the facts critical to the Article III standing question here all remain the same whether we consider LSP's request for a preliminary or permanent injunction. If, as the majority urges, this case really does begin and end with MISO's exclusive authority to assign new transmission projects, how could LSP have standing to seek permanent

injunctive relief on the very same basis against the very same defendants?

Any approach that depends on how MISO, a non-party, would respond to a permanent injunction would run head-long into a basic tenet of standing doctrine: a plaintiff cannot rely on a judgment's domino effect on a non-party to establish redressability. To the contrary, "it is a bedrock principle a federal court cannot redress 'injury that results from the independent action of some third party not before the court.'" *Murthy*, 603 U.S. at 57 (citation omitted).

Nor can a federal court declare a statute unconstitutional in the abstract—Article III always demands a proper defendant capable of redressing the alleged injury. See *California v. Texas*, 593 U.S. 659, 672 (2021) (explaining that "[r]emedies" traditionally "operate with respect to specific parties" (citation omitted)); see also William Baude & Samuel L. Bray, *Proper Parties, Proper Relief*, 137 Harv. L. Rev. 153, 158, 177–79 (2023).

Nothing about how MISO would react to a final judgment expands the enforcement authority of the Commissioners—the only named defendants in this action. See *Haaland v. Brackeen*, 599 U.S. 255, 292–93 (2023) (concluding that plaintiffs lacked Article III standing to enjoin enforcement of a federal law where third parties, not the named defendants, "carry out the court-ordered placements" giving rise to plaintiffs' alleged injury). And nothing about the nature of the relief sought gives the Commission a role in redressing LSP's injury, transforming them into proper defendants. So regardless of any subsequent "developments before FERC or decisions by MISO," Op. at 30, the standing inquiry would remain the same on remand.

I see only two options: either the Commissioners' enforcement authority is sufficient to allow LSP to seek both preliminary and permanent injunctive relief or its authority is insufficient as to both. If, as the majority would have it, the Commission lacks authority to enforce the statute that causes the alleged harm, the proper resolution should be to remand this case to the district court with instructions to dismiss for lack of subject matter jurisdiction. But the panel opinion leaves open the possibility of a different outcome in connection with a permanent injunction on remand because it is unwilling to say that LSP's claim is not justiciable. In this respect, the majority's conclusion is at odds with itself.

Recognize too the incoherence of the Commissioners' position. In advancing the contention that federal law has authorized any violation of the dormant Commerce Clause, the Commissioners emphasize that the Federal Power Act preserves state authority over utility regulation—including in the siting and construction of electric transmission lines. But in their same breath, when it comes to Article III standing, the Commissioners insist the Commission itself is powerless to regulate utility companies operating in Indiana—through, for example, their authority over powerline siting and construction. Try as they might, the Commissioners cannot have it both ways.

Walking even further out on a legal limb, the Commissioners tell us that no arm of Indiana can be sued on a claim that HEA 1420 violates the dormant Commerce Clause. They effectively say that LSP's claim is non-justiciable. With all respect, that position is way off the mark. Foremost, the Commissioners' position flies in the face of the *Ex parte Young* doctrine and cannot be correct—particularly not where, as here,

Indiana law plainly tells us which state officials enforce the statute and plaintiffs have named those precise officials as defendants. The Supreme Court has recognized the dormant Commerce Clause confers a right actionable under § 1983. See *Dennis v. Higgins*, 498 U.S. 439, 440 (1991).

On this point, the majority's opinion struggles. The majority suggests that LSP might cure any defect with respect to Article III's redressability requirement by adding MISO to its lawsuit, faulting the plaintiffs' "tactical choice" not to name MISO as a defendant. Op. at 16. Perhaps that is the skeleton key "development" the majority envisions upon remand. But this solution begs a question: what claim could LSP bring? No one has suggested that MISO—a non-profit, private entity— is a proper § 1983 defendant. So what cause of action would allow a plaintiff to sue MISO as a non-state actor for a violation of the dormant Commerce Clause? The majority opinion offers no answer. And I have been unable to come up with one.

\* \* \*

No doubt the standing question immerses us in the consideration of complicated facts and an equally complicated regulatory scheme. But nothing about that twofold complexity changes what Article III requires to show a redressable injury caused by a state statute. The majority has allowed litigation complexity to overwhelm and cloud a clear takeaway from the authority the Indiana General Assembly gave the State's Utility Regulatory Commission. In the final analysis for me, the named defendants—charged as they are by State law with enforcing Indiana's public utility laws—are positioned to give effect to a judicial order enjoining enforcement of HEA 1420's right of first refusal based on a judicial

determination that the provision likely violates the dormant Commerce Clause.

## II

That brings us to the merits. Recall that these appeals come to us following the district court's grant of a motion for a preliminary injunction. The standard for receiving such relief is clear. "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20.

LSP has satisfied the requirements. HEA 1420 facially discriminates against interstate commerce by imposing differential treatment on companies' ability to compete for new construction projects in Indiana based on their preexisting ownership of transmission facilities in the State. The statute fails to satisfy strict scrutiny and nothing in the Federal Power Act reflects that Congress authorized this dormant Commerce Clause violation with a clear statement. I also see no abuse of discretion in the district court's weighing of the equitable considerations.

## A

The Constitution extends to Congress the power to "regulate Commerce … among the several States." U.S. Const. art. I, § 8, cl. 3. But the Supreme Court has long interpreted the Commerce Clause to also contain a "dormant" or "negative" component, which prohibits states and municipalities from "erecting barriers to the free flow of interstate commerce." *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440

(1978). This restraint on state action applies even when Congress has "failed to legislate on the subject." *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

"To determine whether a law violates this so-called 'dormant' aspect of the Commerce Clause," the first question is whether the challenged measure "discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). "Discrimination" in this context "means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Env't Quality of State of Or.*, 511 U.S. 93, 99 (1994). A state law discriminating in this way is "subject to a 'virtually *per se* rule of invalidity,' which can only be overcome by a showing that the State has no other means to advance a legitimate local purpose." *United Haulers*, 550 U.S. at 338–39 (quoting *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978)).

B

These principles find straightforward application to HEA 1420. The statute provides a benefit—a right of first refusal—only to companies who already own transmission facilities in Indiana. And it does so to the exclusion of all potential out-of-state competitors, who must wait for an incumbent to decline a new project before having a chance to enter the bidding mix. HEA 1420 disfavors—discriminates against—companies wanting to construct transmission lines in Indiana but currently lacking a presence there.

The differential treatment is express on the statute's face. HEA 1420 defines "incumbent" as a "public utility that owns, operates, and maintains an electric transmission facility *in*

*whole or in part in Indiana.*" Ind. Code § 8-1-38-2 (emphasis added). An "in-state presence requirement" of this type runs contrary to the principle that states "cannot require an out-of-state firm 'to become a resident in order to compete on equal terms.'" *Granholm v. Heald*, 544 U.S. 460, 475 (2005) (quoting *Halliburton Oil Well Cementing Co. v. Reily*, 373 U.S. 64, 72 (1963)). This suffices to establish facial discrimination.

The Commissioners urge that HEA 1420 draws a neutral distinction between incumbents—electric transmission owners whose existing facilities will connect to the approved new project—and all other entities, regardless of whether they are in-state or out-of-state. Regulating based on incumbency status, they argue, does not discriminate according to a company's presence in Indiana because a company that is an incumbent as to some projects (those that connect to their facilities) will not be an incumbent as to other projects (those that do not).

But that position falters on another well-established principle: a state law is "no less discriminatory" because in-state businesses "are also covered by the prohibition." *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994); see also *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354 n.4 (1951). HEA 1420, like the ordinance in *Carbone*, provides a preference to "favored operator[s]" in Indiana—the incumbents—and deprives out-of-state entities the opportunity to compete for transmission projects on the same terms. 511 U.S. at 391. It makes no difference, then, that when the Indiana statute confers a right of first refusal on an in-state incumbent, it disadvantages both out-of-state entities and in-state non-incumbents alike. That Indiana has also frozen out these in-state

would-be-competitors is irrelevant to the facial discrimination analysis.

The Fifth Circuit charted this same course of reasoning in *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306 (5th Cir. 2022). The court held that a Texas law providing a right of first refusal to incumbent transmission owners facially discriminated against interstate commerce. "Limiting competition based on the existence or extent of a business's local foothold," the court explained, "is the protectionism that the Commerce Clause guards against." *Id.* at 326. And while the Fifth Circuit confronted a different statutory scheme, the principles guiding its reasoning apply with full force to HEA 1420.

The Eighth Circuit's contrary analysis in *LSP Transmission Holdings, LLC v. Sieben*, 954 F.3d 1018 (8th Cir. 2020), which found a Minnesota right-of-first-refusal law non-discriminatory, comes up short, in my respectful view. A focus on where the companies who benefit from a protectionist measure are "based" does not resolve the question of whether the law discriminates against interstate commerce. No matter if a company is incorporated or headquartered in the state, a statute providing a legal benefit predicated on a company's physical presence there triggers scrutiny under the dormant Commerce Clause. See *Lake*, 48 F.4th at 323–24 (collecting cases).

C

The conclusion that HEA 1420 discriminates against interstate commerce brings us to the question of tailoring. Where a statute discriminates against nonresident economic actors or out-of-state goods, the law can be sustained only if the state shows it has "no other means to advance a legitimate local

purpose." *United Haulers*, 550 U.S. at 338–39. The Supreme Court has told us that this standard imposes an "extremely difficult burden" and requires the "strictest scrutiny." *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581–82 (1997) (citation omitted).

The Commissioners say that HEA 1420 protects the safety of Indiana residents and promotes the reliability and stability of its electric grid. But review of the statutory scheme confirms the right of first refusal is not necessary for the State to achieve this goal.

HEA 1420 does not compel incumbents to accept a new business opportunity and construct transmission projects that connect to their existing facilities. Rather it confers a right of first refusal—it offers them first choice to accept such projects. The State might reasonably prefer incumbents to undertake projects which connect to their existing lines. But if this was truly necessary for safety and reliability of the electric grid, Indiana would not open the project to competitive bidding. What is more, regardless of which company is awarded a project, they will be subject to extensive federal and state regulation in the construction and operation of the transmission line.

I would hold that HEA 1420 violates the dormant dimension of the Commerce Clause.

## D

The Commissioners press two additional arguments that warrant response. Each attempts to remove HEA 1420 from dormant Commerce Clause scrutiny altogether—even if the statute facially discriminates against out-of-state power suppliers and Indiana has other means to advance its interest. But both contentions fall flat.

1

The Commissioners first contend that the Supreme Court's decision in *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), forecloses LSP's challenge. Not so in my view.

*Tracy* is difficult to distill into a simple description. The case involved an Ohio law which provided a tax exemption to local distributors of natural gas but not to out-of-state bulk gas sellers. See *id.* at 281–83. This tax exemption operated in two different retail markets. The local distributors sold natural gas to residential and small-business customers in a "captive" monopoly market, where gas was "bundled" with protections mandated by state regulators and the distributors served all customers at restricted rates. See *id.* at 296–99, 303–04. But the exemption also applied to sales these local distributors made in the separate, competitive market for large industrial customers—where they competed against out-of-state companies, who sold "unbundled" gas and whose sales were not tax exempt. See *id.* at 282–83, 297–98, 302. General Motors, which bought natural gas from the out-of-state sellers, appealed Ohio's application of the tax to its purchases, alleging that the differential tax treatment violated the Commerce Clause. See *id.* at 285.

In upholding the challenged Ohio statute, the Supreme Court focused on the purposes of the dormant Commerce Clause doctrine. Where companies provide different products in different markets and would continue to do so even if the alleged discriminatory burden on interstate commerce were removed, the Court explained, "eliminating the … regulatory differential would not serve the dormant Commerce Clause's fundamental objective of preserving a national market for competition undisturbed by preferential advantages

conferred by a State upon its residents or resident competitors." *Id.* at 299.

Because the local, captive market was a regulated monopoly, "competition would not be served by eliminating any tax differential as between sellers, and the dormant Commerce Clause ha[d] no job to do." *Id.* at 303. But eliminating this disparity between the companies in the noncaptive market, on the other hand, might intensify competition. See *id.* The case thus turned on whether to "accord controlling significance to the noncaptive market in which they compete, or to the noncompetitive, captive market in which the local utilities alone operate[.]" *Id.* at 303–04.

*Tracy* chose to give "greater weight to the captive market" and the local distribution companies' "singular role in serving [that market]." *Id.* at 304. Invalidating the tax exemption, the Supreme Court determined, could "imperil" the distributors' ability to serve the captive market by reducing their competitive advantage. *Id.* at 304–07. So the Court rejected the dormant Commerce Clause challenge and let the Ohio statute stand.

The Commissioners see incumbents under HEA 1420 as situated like the local distributors in *Tracy* and, from that observation, argue that Indiana state law should be permitted to treat these companies differently than non-incumbents. Incumbents own the existing facilities that will be upgraded or to which new transmission lines will connect and so, the argument goes, are in a materially different position to undertake construction than a new operator. Further, they urge, many Indiana incumbents are vertically integrated utilities (meaning they generate, transmit, and distribute electricity)

and serve captive retail customers, just like the *Tracy* local distributors.

In insisting on a side-by-side comparison with *Tracy*, the Commissioners overlook a crucial fact supporting the Court's decision there that is not present here. The natural gas companies primarily operated in two different markets (one captive, one competitive) and the challenged law regulated both. See *Camps Newfound*, 520 U.S. at 582 n.16 (observing that *Tracy* "premised its holding that the statute at issue was not facially discriminatory on the view that sellers of 'bundled' and 'unbundled' natural gas were principally competing in different markets").

HEA 1420, by contrast, governs only a single competitive market: the market to construct transmission lines that connect to the interstate power grid, where vertically integrated utilities compete alongside independent transmission operators. "In the market for transmission of electricity," the Fifth Circuit recognized, "vertically integrated utilities and transmission-only companies compete and offer the same services: building, operating, and owning transmission lines." *Lake*, 48 F.4th at 319 (interpreting and applying *Tracy*). HEA 1420's right of first refusal stifles competition in this market. Indeed, the reason that several incumbent power suppliers intervened in this litigation to defend the Indiana law is to avoid having to compete for these projects through competitive bidding.

HEA 1420 does not regulate a "noncompetitive, captive market in which the local utilities alone operate[.]" *Tracy*, 519 U.S. at 303–04. And *Tracy* cannot be read to remove from Commerce Clause scrutiny laws regulating a single market where vertically integrated utilities undoubtedly compete alongside other transmission-only operators. See *Energy*

*Mich., Inc. v. Mich. Pub. Serv. Comm'n*, 126 F.4th 476, 492–97 (6th Cir. 2025) (explaining that *Tracy* should be limited "to its unique factual setting").

It is easy to get lost in the weeds of *Tracy*, but do not let all of this detail create confusion. The clearest principle to be derived from the case is that the ordinary rules of dormant Commerce Clause jurisprudence can sometimes give way when their application would not serve the doctrine's core aim: protecting competition in interstate markets. Because HEA 1420 undermines this objective, I have little trouble concluding that *Tracy* does not save it.

2

The Commissioners' final effort to save HEA 1420 comes with the contention that Congress in the Federal Power Act authorized states to enact right of first refusal laws like this one. Here, too, I disagree. Having reviewed the Federal Power Act, I do not see anywhere where Congress supplied the necessary clear statement to immunize a dormant Commerce Clause violation.

"[F]or a state regulation to be removed from the reach of the dormant Commerce Clause," the Supreme Court has emphasized, "congressional intent must be unmistakably clear." *S.-Cent. Timber Dev., Inc. v. Wunnicke*, 467 U.S. 82, 91 (1984). "The requirement that Congress affirmatively contemplate otherwise invalid state legislation is mandated by the policies underlying dormant Commerce Clause doctrine," *id.* at 91–92, and a state has the "burden of demonstrating a clear and unambiguous intent on behalf of Congress to permit the discrimination against interstate commerce," *Wyoming v. Oklahoma*, 502 U.S. 437, 458 (1992). By contrast, the mere "fact that the

state policy … appears to be consistent with federal policy—or even that state policy furthers the goals we might believe that Congress had in mind—is an insufficient indicium of congressional intent." *S.-Cent. Timber Dev.*, 467 U.S. at 92.

The Federal Power Act contains no unambiguous statement of congressional intent to authorize state rights of first refusal. The Commissioners rely on the so-called savings clause of the Act, which reserves for the states authority over "facilities used for the generation of electric energy," "facilities used in local distribution or only for the transmission of electric energy in intrastate commerce," and "facilities for the transmission of electric energy consumed wholly by the transmitter." 16 U.S.C. § 824(b)(1). Our court has interpreted this language to retain state authority over "the location and construction of electrical transmission lines." *Ill. Com. Comm'n v. FERC*, 721 F.3d 764, 773 (7th Cir. 2013). But Congress giving states authority over siting and construction is a far cry from Congress empowering states to discriminate in favor of in-state interests with respect to interstate transmission lines.

If the lack of a clear statement alone was not enough, the Supreme Court has twice rejected that the Federal Power Act's savings clause constitutes "an affirmative grant of power to the states to burden interstate commerce 'in a manner which would otherwise not be permissible.'" *New England Power Co. v. New Hampshire*, 455 U.S. 331, 341 (1982) (citation omitted). In *New England Power* the Court held that the Federal Power Act did not permit a state to restrict the interstate transmission of hydroelectric power, despite the savings clause's additional assurance that the Act would not deprive a state "of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a

State line." 16 U.S.C. § 824(b)(1). Notwithstanding this language, the Court explained that "[n]othing in the legislative history or language of the statute evinces a congressional intent to alter the limits of state power otherwise imposed by the Commerce Clause." *New England Power*, 455 U.S. at 341 (internal quotation marks omitted) (citation omitted). And that case presented a stronger basis for congressional authorization than rights of first refusal, as the Federal Power Act's savings clause does specifically speak to state authority over hydroelectric energy.

The Supreme Court returned to the Power Act a decade later and reached the same conclusion. The savings clause, the Court reaffirmed, "simply saves from pre-emption under Part II of the Federal Power Act such state authority as was otherwise 'lawful.'" *Wyoming*, 502 U.S. at 458 (quoting *New England Power*, 455 U.S. at 341) (declining to find congressional approval of state law reserving a segment of the Oklahoma coal power market for Oklahoma-mined coal). Leaving nothing to doubt, the Court underscored that its decisions "have uniformly subjected Commerce Clause cases implicating the Federal Power Act to scrutiny on the merits." *Id.*

Against the backdrop of Supreme Court precedent requiring a clear statement and explicitly rejecting that the savings clause contains such a statement, I see no indication—and definitely no clear statement—that Congress authorized the violation of the dormant Commerce Clause perpetrated by HEA 1420.

## III

In addition to likelihood of success on the merits, a party seeking a preliminary injunction must show that it "is likely

to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in [its] favor, and that an injunction is in the public interest." *Higher Soc'y of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017) (quoting *Winter*, 555 U.S. at 20). The district court was right to conclude that each of these factors weighs in LSP's favor.

"The existence of a continuing constitutional violation," we have emphasized, "constitutes proof of an irreparable harm, and its remedy certainly would serve the public interest." *Preston v. Thompson*, 589 F.2d 300, 303 n.3 (7th Cir. 1978). And LSP further faces irreparable harm based on its showing that, absent an injunction, it will be deprived of the equal opportunity to compete for billions of dollars in Indiana transmission projects—which HEA 1420 sets aside for incumbents.

On the other side of the scale, the Commissioners contend that a preliminary injunction threatens the safety, stability, and reliability of the transmission grid in Indiana. But this concern rings hollow. The transmission projects implicated by HEA 1420 are all future projects—scheduled for completion years down the road. If an incumbent were to decline to exercise their right of first refusal, as the statute permits, that alone would initiate a lengthy competitive bidding process for the project. A preliminary injunction does not imminently threaten any Indiana residents losing power or hamper the ability of current operators to respond to service disruptions. So I fail to see irreparable harm in requiring incumbents to compete for these planned projects in the first instance.

The Commissioners have not shown that the district court clearly erred in its evaluation of the other preliminary injunction factors.

\* \* \*

For these reasons, I respectfully dissent and would affirm the district court's entry of a preliminary injunction.